**CALIFORNIA STATE BOARD OF OPTOMETRY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent,**

**National Association of Optometrists and Opticians, Intervenor.**

**89–1190, 89–1191, 89–1202, 89–1293, 89–1301, 89–1307, 89–1308, 89–1314, 89–1316 and 89–1317.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1990.

Decided Aug. 28, 1990.

Thomas S. Lazar (for California State Bd. of Optometry), with whom Sara Rittman (for Missouri State Bd. of Optometry), Steve Clark and Mary B. Stallcup (for Arkansas State Bd. of Optometry), Allen R. Grossman (for State of Fla. and Florida State Bd. of Optometry), Kenneth O. Eikenberry and John H. Keith (for Washington State Bd. of Optometry), Debra W. Jeppson (for State of Nev. and Nevada State Bd. of Optometry), Fred W. Stork III (for Arizona State Bd. of Optometry), and Roger L. Chaffe and Howard M. Casway (for intervenor Virginia Bd. of Optometry), were on the joint brief, for petitioner/intervenor States and/or State Boards of Optometry.

Edward A. Groobert, with whom Ellis Lyons, Bennett Boskey, D. Biard MacGuineas, and Morris Klein (for American Optometric Ass'n), and William A. Gould, Jr., Alan G. Perkins, and Mark L. Andrews (for California Optometric Ass'n), were on the joint brief, for petitioners in Nos. 89–1191 and 89–1202.

Lawrence DeMille–Wagman, Atty., Federal Trade Com'n ("FTC"), with whom Jay C. Shaffer, Acting Gen. Counsel, and Ernest J. Isenstadt, Asst. Gen. Counsel, FTC, were on the brief, for respondent.

Andrew J. Pincus, with whom Kenneth S. Geller was on the brief, for intervenor Nat. Ass'n of Optometrists and Opticians in Nos. 89–1190, 89–1191, and 89–1202.

Steven S. Honigman, Donald S. Dawson, and M. Joseph Stoutenburgh, were on the joint brief, for amici curiae American Ass'n of Retired Persons and the Opticians Ass'n of America.

Paul Farley, Asst. Atty. Gen. of New Mexico, H. Al Cole, Jr., Sr. Deputy Atty. Gen. of North Carolina, and Craig M. Eichstadt, Asst. Atty. Gen. of South Dakota, were on the joint brief, for amici curiae States of N.M., Ala., Colo., Miss., N.C., S.D., Tex., Utah and Wyo.

Fred Niemann, Jr., was on the brief, for amicus curiae Texas Optometric Ass'n, Inc.

Peter M. Sfikas and Werner Strupp, were on the joint brief, for amici curiae American Dental Ass'n and American Podiatric Medical Ass'n.

Mary C. Jacobson, Deputy Atty. Gen., Andrea M. Silkowitz, Asst. Atty. Gen., and Regina H. Nugent, Deputy Atty. Gen., were on the brief, for amici curiae New Jersey State Bd. of Optometry and the New Jersey State Bd. of Ophthalmic Dispensers and Ophthalmic Technicians and State of Or.

Thomas J. Gillooly, Senior Deputy Atty. Gen., was on the brief, for amicus curiae State of W.Va.

Kathlyn Rhodes entered an appearance, for petitioners State of Okl. and the Okla-

homa Bd. of Examiners in Optometry in No. 89–1316.

Randall W. Childress entered an appearance, for amicus curiae State of N.M.

Before WALD, Chief Judge, and BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The American Optometric Association, the California Optometric Association, and several States or state boards of optometry challenge a Federal Trade Commission rule that declares certain state laws restricting the practice of optometry to be unfair acts or practices. We find that the FTC lacked the statutory authority to promulgate the rule because Congress did not authorize the Commission to regulate the sovereign acts of the States.

## I. BACKGROUND

### A. Statutory Framework

As enacted in 1914, the Federal Trade Commission Act ("Act") empowered the FTC to prevent persons, partnerships, and corporations "from using unfair methods of competition in commerce." *See* Act, ch. 311, § 5, 38 Stat. 719 (1914). In 1938, Congress amended section 5 to authorize the Commission to prevent "unfair or deceptive acts or practices" as well as unfair methods of competition. Wheeler–Lee Amendment to the FTC Act, ch. 49, § 3, 52 Stat. 111 (1938). Finally, in 1975, Congress expanded the scope of section 5 to encompass acts "affecting" commerce. Magnuson–Moss Warranty—FTC Improvement Act, § 202(a), 88 Stat. 2193 (1975) ("Magnuson–Moss Amendments"). Thus, the relevant language of section 5(a) now reads as follows:

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(2) The Commission is empowered and directed to prevent persons, partner-

ships, or corporations ... from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a) (1988).

The Magnuson–Moss Amendments also added section 18 to the Act, which grants the FTC rulemaking authority to define specific acts or practices as unfair. Section 18(a)(1) provides that

the Commission may prescribe—

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce ..., and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce.... Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

*Id.* § 57a(a)(1) (1988).

### B. Procedural Background

These consolidated petitions seek review of the FTC's Ophthalmic Practice Rules, 54 Fed.Reg. 10,285 (1989) ("Eyeglasses II" or "rule").

Beginning in the mid–1970's, the FTC began to investigate state-imposed restrictions on the practice of optometry. These tended to discourage the "commercial practice" of optometry—such as partnerships between optometrists and laymen, use of trade names, and chain operations combining the practice of optometry with the sale of eyeglasses in shopping centers—in favor of "traditional optometric practice" typified by sole practioners operating in professional office buildings under their own names. The FTC's studies indicated that these restrictions resulted in higher prices and reduced the quality of eye care available to the public.

In 1980, the FTC published the results of its investigation and issued an Advance Notice of Proposed Rulemaking requesting comments and recommendations. 45 Fed. Reg. 79,823 (1980). The Commission formally initiated a rulemaking proceeding in

1985, 50 Fed.Reg. 598 (1985), and, on March 13, 1989, issued Eyeglasses II. 54 Fed.Reg. 10,285 (1989). Commission Chairman Daniel Oliver voted against adoption of the rule based on principles of federalism and his view that the FTC was without authority to promulgate it. *Id.* at 10,305.

Eyeglasses II revised Title 16, Part 456 of the Code of Federal Regulations to include a new section 456.4, "State bans on commercial practice," which begins as follows:

> (a) It is an unfair act or practice for any *state or local governmental entity* to:
>
> > (1) Prevent or restrict optometrists from entering into associations with lay persons or corporations....

*Id.* at 10,305 (emphasis added). There follows an extensive list of the acts or practices the FTC found to be unfair, including state laws or regulations prohibiting laymen from employing optometrists to provide optometric services, limiting the number of offices that may be owned or operated by optometrists individually or as participants in such associations, and prohibiting them from practicing in department stores or shopping centers, or from practicing under any name other than their own. *Id.*

Eyeglasses II provides that the rule may be used as a defense to any state proceeding brought against an optometrist or his affiliated entity for violating those state laws or rules declared by the rule to be unfair practices. *Id.* (to be codified at 16 C.F.R. § 456.5(b)). The rule disclaims, however, any intention to interfere with the authority of state or local governments to safeguard the health and safety of the recipients of eye care services, including their authority to require that optometric services be provided only by a person qualified to do so by such state or local law and to establish minimum quality standards for ophthalmic goods and services. *Id.* (to be codified at 16 C.F.R. § 456.5(a)). Finally, it defines a "person" as "any individual, partnership, corporation, association *or other entity.*" *Id.* at 10,304 (to be codified at 16 C.F.R. § 456.1(g)) (emphasis added).

Petitioners challenge all of these provisions. Several interested parties appear as *amici curiae* arguing for and against the rule.

## II. DISCUSSION

Petitioners challenge Eyeglasses II on both statutory and constitutional grounds. They also attack the factual record upon which the FTC based its decision to adopt the rule. Because we agree with petitioners that the rule exceeds the FTC's statutory authority and vacate it on that basis, we do not address the alternative grounds presented.

Eyeglasses II declares that certain state-imposed restrictions on the practice of optometry are unfair acts or practices. The question of the Commission's authority to promulgate the rule presents two specific issues of statutory interpretation: whether a State acting in its sovereign capacity is a "person" within the FTC's enforcement jurisdiction under section 5(a)(2) of the Act, and whether a state law may be an unfair or deceptive act or practice within the FTC's rulemaking authority under section 18(a)(1).

In reviewing the FTC's interpretation of its organic act, we must first determine whether Congress had an intention on the question at issue using the traditional tools of statutory construction. *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781 & n. 9, 81 L.Ed.2d 694 (1984). These tools include the language and structure of the Act, its legislative history, and any applicable canons of statutory construction. *See Dole v. United Steelworkers of America,* —— U.S. ——, 110 S.Ct. 929, 934–35, 937 & n. 7, 108 L.Ed.2d 23 (1990); *see also Michigan Citizens for an Indep. Press v. Thornburgh,* 868 F.2d 1285, 1292–93 (D.C.Cir.) ("If employment of an accepted canon of construction illustrates that Congress had a specific intent on the issue in question, then the case can be disposed of under the first prong of *Chevron.*") (emphasis deleted), *aff'd without opinion by an equally divided Court,* —— U.S. ——, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989) (per curiam).

There is nothing in the language of sections 5(a) and 18(a)(1) to indicate that Congress intended to authorize the FTC to reach the "acts or practices" of States acting in their sovereign capacities. The legislative history of the Act suggests that at the time of its original enactment, Congress was concerned with the anticompetitive conduct of *businesses*, whether organized as corporations, partnerships, associations, or sole proprietorships. The House Report declared that the purpose of the Act was to empower the FTC to stop monopolies "at the threshold [by] prevent[ing] unfair competition," H.R.Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914); *see also FTC v. Raladam Co.*, 283 U.S. 643, 647–50, 51 S.Ct. 587, 589–90, 75 L.Ed. 1324 (1931) (discussing purposes of the Act); its sponsor stated that the FTC's power under section 5 extended

> to persons, partnerships, and corporations, and with respect to the great *industrial activities* in interstate commerce. It embraces … every kind of person, natural or artificial, *who may be engaged in interstate commerce.*

*See* 51 Cong.Rec. 14,928 (remarks of Rep. Covington) (emphasis added). We can find nothing in the language or history of subsequently adopted amendments to support a finding that Congress has expanded the FTC's jurisdiction to embrace state action. In the absence of any evidence of such a purpose, we turn to well-established rules of statutory construction, which we find dispositive. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) ("ordinary canons of statutory construction compelling").

The Supreme Court has observed that "in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it." *Will v. Michigan Dep't of State Police*, —— U.S. ——, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989) (internal quotes omitted) (holding that a State is not a person within the meaning of 42 U.S.C. § 1983); *see also Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979); *United States v. Cooper Corp.*, 312 U.S. 600, 604,

61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941). On the other hand, several Supreme Court decisions hold that a State *is* a person for purposes of the antitrust laws. *See Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories*, 460 U.S. 150, 155, 103 S.Ct. 1011, 1015, 74 L.Ed.2d 882 (1983) (the words "persons" and "purchasers" in the Robinson–Patman Act are "sufficiently broad to cover governmental bodies") (internal quotes omitted); *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 395, 98 S.Ct. 1123, 1127, 55 L.Ed.2d 364 (1978) ("the definition of 'person' or 'persons' [in the antitrust laws] embraces both cities and States"); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–61, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972) (State may sue as a "person" under section 4 of the Clayton Act); *Georgia v. Evans*, 316 U.S. 159, 162, 62 S.Ct. 972, 974, 86 L.Ed. 1346 (1942) (State may sue under section 7 of the Sherman Act).

■ Although a State may be a "person" for purposes of the antitrust laws, it is equally clear, under the "state action" doctrine enunciated in *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), that when a State acts in a sovereign rather than a proprietary capacity, it is exempt from the antitrust laws even though those actions may restrain trade. *See City of Lafayette*, 435 U.S. at 391, 98 S.Ct. at 1125; *see also id.* at 408–13, 98 S.Ct. at 1134–36 (state action doctrine provides antitrust immunity for actions taken in a State's capacity as sovereign but does not cover proprietary functions carried out by municipal subdivisions of the State) (plurality opinion of Brennan, J.). Thus, properly framed, the question before us is not simply whether a State is a person under section 5(a)(2) of the Act, but whether a State acting in its sovereign capacity is subject to the Act.

■ The *Parker* state action doctrine has been applied to limit the reach of the FTC's enforcement jurisdiction. *See Massachusetts Furniture & Piano Movers Ass'n v. FTC*, 773 F.2d 391, 394–97 (1st Cir.1985). *Parker* and later cases applying

the doctrine, however, have involved judicial interpretations of the relevant statutes in the context of an adjudication, while in this case we consider whether the doctrine limits the FTC's rulemaking authority. When engaged in rulemaking pursuant to section 18(a)(1), the Commission itself exercises substantive lawmaking authority delegated to it by Congress. Petitioners argue that we should extend the state action doctrine to limit the FTC's rulemaking authority as well.

Because the rule of statutory construction employed by the Court in *Parker* applies with equal force in this context, we conclude that the state action doctrine is applicable to limit the FTC's rulemaking authority. In holding that the Sherman Act was not intended to apply to the acts of States as sovereigns, the Court observed that it could

> find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an *unexpressed purpose* to nullify a state's control over its officers and agents *is not lightly to be attributed* to Congress.

*Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313 (emphasis added). The Supreme Court has since applied this rule of construction in many cases involving issues of federalism. In *Will,* for example, the Court articulated the following "ordinary rule of statutory construction":

> [I]f Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute."

109 S.Ct. at 2308 (quoting *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)). The Court explained the rationale for this rule as follows:

> "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that *the legislature* has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."

*Id.,* 109 S.Ct. at 2308–09 (emphasis added) (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)).

This rule of statutory construction serves to ensure that the States' sovereignty interests are adequately protected by the political process. In *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 547–55, 105 S.Ct. 1005, 1015–19, 83 L.Ed.2d 1016 (1985), the Supreme Court held that the Tenth Amendment does not impose substantive limitations on federal legislative power. Rather, "State sovereign interests" are "properly protected by procedural safeguards inherent in the structure of the federal system," *id.* at 552, 105 S.Ct. at 1018, *e.g.,* the States' equal representation in the Senate. *Id.* at 551, 105 S.Ct. at 1017. "[T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result." *Id.* at 554, 105 S.Ct. at 1019.

The Commission nevertheless insists that

> [i]n providing the Commission with Section 18 rulemaking authority, Congress has made a limited delegation to the FTC of its legislative authority to protect consumers from acts or practices that unreasonably interfere with the efficient functioning of interstate markets.

*Eyeglasses II,* 54 Fed.Reg. at 10,296. As it finds the state acts and practices proscribed by the rule to be unfair, the Commission concludes that "Congress authorized the FTC to challenge" them in a section 18 rulemaking. *Id.* Were we to defer to this construction and uphold Eyeglasses II in the face of congressional silence, we would short-circuit the protections offered States by the political process. *See* L. Tribe, *American Constitu-*

*tional Law* § 6–25, at 480 (2d ed. 1988) ("to give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for law-making on which *Garcia* relied to protect states' interests") (emphasis in original); *The Supreme Court, 1987 Term—Leading Cases,* 102 Harv.L.Rev. 143, 296 (1988) ("A rule that distills displacement of state law from congressional *silence* divests states of even *Garcia's* slender procedural guarantee.") (emphasis in original).

The clear statement doctrine leaves no room for inferences. An agency may not exercise authority over States as sovereigns unless that authority has been unambiguously granted to it. When one applies this rule of construction to sections 5 and 18(a)(1) of the Act, it becomes clear that the FTC had no authority to promulgate Eyeglasses II.

First, state regulation of the practice of optometry is a quintessentially sovereign act. Second, there can be little question that accepting an interpretation of the Act that sanctions the rule would alter the usual balance between the Federal Government and the States. The rule subjects States to direct FTC regulation by declaring that certain state laws constitute unfair acts or practices. It thus empowers the FTC directly to "prevent" States from imposing certain restrictions on the practice of optometry. *See* 15 U.S.C. § 45(a)(2). Third, nothing in either the language of the Act or its legislative history evidences a congressional intent to alter the state-federal balance as the rule would. The Magnuson–Moss Amendments, which codified the FTC's rulemaking authority, contain no language that could be construed as an explicit congressional authorization to reach the sovereign acts of the States. This silence is especially compelling in view of Congress's more than thirty years of experience with the state action doctrine at the time it enacted section 18(a)(1). As nothing in the language of the Act clearly expresses a congressional intent to empower the FTC to regulate state action, we must reject the rule.

### III. CONCLUSION

Because we find that the FTC has acted beyond its statutory authority in promulgating Eyeglasses II, we grant these petitions and vacate the rule.

*So ordered.*